## COURT OF COMMON PLEAS, JUVENILE DIVISION
## CUYAHOGA COUNTY, OHIO

IN THE MATTER OF:  JAYVON BENTON

CASE NO:  DL15113409

JUDGE:  ALISON L. FLOYD

<u>MAGISTRATE'S ORDER</u>

This matter came on for consideration this 4th day of April, 2016 before Magistrate Retanio Aj Rucker upon the Complaint of the affiant as to the child herein alleged to be Delinquent.

The Magistrate finds that the notice requirements have been met and that all necessary parties were present on March 2, 2016 in Court.  The following persons were present for the hearing:  Jayvon C. Benton, child; Gwendolyn Shearer, mother; Denielle Yencha, Investigative Probation Officer (<u>via</u> report); Morgan Pirc, Public Defender; Brandon A. Piteo, Assistant Prosecuting Attorney, James S. Gallagher, Assistant Prosecuting Attorney; and Paul Hanna, Assistant Prosecuting Attorney Legal Intern.  The parties have counsel.

I.  <u>Procedural Matter No. 1</u>--At the conclusion of the State of Ohio's (hereinafter, at times, referred to as the "State") case, but prior to the close thereof, the Prosecuting Attorney asked the Court to admit State's Exhibit Nos. 2 and 3 into evidence.  There being no objection, the Motion to Admit the identified exhibits is well taken by the Court.  As such, State's Exhibit Nos. 2 and 3 are admitted into evidence.  <u>See</u>, March 2, 2016 Transcript at Page 173, Lines 20 through 21.  (From this point forward, all references to the March 2nd Transcript shall be delineated as "Tr. p. __, l.__").

II.  <u>Procedural Matter No. 2</u>--At the conclusion of the alleged delinquent's case, but prior to the close thereof, the Public Defender asked the Court to admit Defense Exhibits A through D into evidence.  There being no objection, the Motion to Admit the identified exhibits is well taken by the Court.  As such, Defense Exhibits A through D are admitted into evidence.  Tr. p. 214, l. 10-12.

III.  <u>Statement of the Operative Facts</u>

On or about August 28, 2015, the alleged delinquent was arrested by the Cuyahoga Metropolitan Housing Authority (hereinafter referred to as "CMHA") police relative to a stolen vehicle.  <u>See</u>, Tr. p. 28, l. 22-25; p. 29, l. 1-7; p. 89, l. 22-25; p. 90, l. 1-9 and 22-25; and p. 91, l. 1-4.  The subject vehicle was a Black Ford Fusion.  <u>See</u>, Tr. p. 85, l. 21-24; p. 86, l. 8-9; p.87, l. 6-25; p. 88, l. 1-15; p. 89, l. 22-25; and p. 90, l. 1-10.  Upon his arrest, the child, a juvenile, was transported to the Cuyahoga County Court of Common Pleas, Juvenile Division (hereinafter referred to as the "Cuyahoga County Juvenile Court") Detention Center, <u>i.e.</u>, secure detention, where he was being held pending further proceedings with respect thereto.  Tr. p. 29, l. 8-15 and 22-25; and p. 30, l. 1.

On August 31, 2015, the State of Ohio (hereinafter, at times, referred to as the "State") filed a two (2) count Complaint against the alleged delinquent in case No. DL15111991.  The August 31st Complaint alleged that the child had committed the crimes of Receiving Stolen Property, a felony of the fourth degree, in violation of Section 2913.51 of the Ohio Revised Code (hereinafter referred to as either "RC" or the "revised code") (Count 1) and Obstructing Official Business, a misdemeanor of the second degree, in violation of RC Section 2921.31 (Count 2).  The Complaint in case ending 991 involved the afore-mentioned Black Ford Fusion.  <u>See</u>, Tr. p. 95, l. 22-24.

On August 31, 2015, the alleged delinquent was arraigned by the Cuyahoga County Juvenile Court Detention Center Magistrate relative to the August 31st Complaint in case ending 991.  <u>See</u>, Cuyahoga County Juvenile Clerk of Court's (hereinafter referred to as the "Clerk") Journal at volume 113, page 79 as journalized on September 3, 2015.  (From this point forward, all references to the Clerk's Journal shall be delineated as "Clerk's Journal at vol. __, p. __ on __").  See also, Defense Exhibit C.  The Cuyahoga County Public Defender's Office, Juvenile Division (hereinafter referred to as either the "PDs Office" or  the "Public Defender") was appointed by the Court to represent the child in case ending 991.  <u>Id</u>.  At the conclusion of the August 31st hearing, the child was remanded by the Magistrate back to the Detention Center, <u>i.e.</u>,

secure detention, pending further proceedings in the matter. Id. See also, Tr. p. 95, l. 25 and p. 96, l. 1-3.

On or about August 28, 2015, Sergeant Thomas Shoulders (hereinafter referred to as either "Sgt. Shoulders" or the "Detective"), a Detective with the City of Cleveland, Division of Police (hereinafter referred to as either the "Police Department" or the "police") Second District, was assigned to investigate, among other crimes, an aggravated robbery involving a Black Ford Fusion. Tr. p. 28, l. 22-25; p. 29, l. 1-11; p. 85, l. 21-24; and p. 87, l. 6-22. Upon learning that the vehicle-in-question was found by the CMHA police, Sgt. Shoulders reviewed several CMHA and Police Department reports to determine a suspect or suspects in said investigation. Tr. p. 28, l. 22-25; p. 29, l. 1-15; p. 85, 21-24; p. 87, l. 6-25; p. 88, l. 1 and 10-13; p. 89, l. 22-25; p. 90, l. 1-10 and 22-25; and p. 91, l. 1-4. The Detective's resulting investigation identified the child as a suspect in the Black Ford Fusion aggravated robbery investigation. Tr. p. 28, l. 22-25; p. 29, l. 1-15; p. 89, l. 22-25; p. 90, l. 1-10 and 22-25; p. 91, l. 1-4; p. 96, l. 17-25; p. 97, l. 3-11; p. 98, l. 7-13; p. 101, l. 15-25; and p. 102, l. 1-17. See also, Defense Exhibit A.

As part of his investigation, Sgt. Shoulders learned that the alleged delinquent had not been processed by the Police Department relative to the Black Ford Fusion receiving stolen property charge. Tr. p. 29, l. 12-15 and p. 30, l. 1. Rather, he (the child) was brought directly from the arrest site to the Detention Center by the CMHA police. Id. Consequently, the Detective contacted the Detention Center for the purpose of picking up the child, taking him to the Cuyahoga County Adult Justice Center (hereinafter referred to as the "Justice Center") and processing him as part of the Black Ford Fusion receiving stolen property charge. Tr. p. 28, l. 22-25; p. 29, l. 1-25; p. 30, l. 1; p. 33, l. 11-19; p. 95, l. 6-8 and 19-25; p. 96, l. 1-3 and 17-25; p. 103, l. 20-23; p. 104, l. 2. See also, Defense Exhibit A. According to the Detective, the Office of the Cuyahoga County Prosecuting Attorney (hereinafter referred to as the "Prosecuting Attorney's Office") advised him that he could remove the child from the Detention Center for processing purposes on the afore-mentioned charge without an arrest warrant, a warrant to convey or an order of the Cuyahoga County Juvenile Court. Tr. p. 106, l. 18-24; p. 107, l. 22-25; p. 108, l. 1-10; p. 110, l. 3-16; p. 154, l. 18-25; and p. 155, l. 1-3. The Prosecuting Attorney's Office's specific instructions to the Detective were to "call and have the [alleged] delinquent, * * * [taken] out of his cell and bring him to have him processed, but [the Detective] was not to talk to him [the child] in regards to the incident that occurred", i.e., case ending 991. Tr. p. 106, l. 18-24; p. 154, l. 18-25; p. 155, l. 1-3; p. 161, l. 4-25; p. 162, l. 1-13; p. 163, l. 11-23; and p. 164, l. 8-25.

Sgt. Shoulders testified that his first three (3) attempts to retrieve the alleged delinquent from the Detention Center were unsuccessful. Tr. p. 30, l. 6-10, p. 31, 25; p. 32, l. 1-8; and p. 105, l. 11-20. On his fourth attempt, the Detective "finally got ahold of somebody that seemed to have some intelligence and said that [he (the Detective)] could take [the child] from the [Detention Center]" without an arrest warrant, a warrant to convey or an order of the Cuyahoga County Juvenile Court. Tr. p. 31, l. 25; p. 32, l. 1-12 and 20-23; and p. 105, l. 17-20. As a result of this fourth attempt, the Detective received "permission" from the intelligent individual to remove the child from the Detention Center for "processing purposes" on the Black Ford Fusion receiving stolen property charge without the required legal paperwork. Tr. p. 33, l. 11-19 and p. 105, l. 11-20. The ability to remove the child from the Detention Center in this manner, according to the Detective, was consistent with his past experience. Tr. 108, l. 1-8.

On September 1, 2015, the day after the alleged delinquent was arraigned on the Complaint in case No. DL15111991 and assigned counsel to represent him with respect thereto, Sgt. Shoulders presented to the Detention Center, per the advice of the Prosecuting Attorney's Office, to retrieve the child for "processing purposes" on the Black Ford Fusion receiving stolen property charge. Tr. p. 36, l. 11-12; p. 106, l. 18-24; p. 107, l. 22-25; and p. 108, l. 1-10. See also, State's Exhibit No. 2. The child was released to the Detective on the authority of the "intelligent individual" without the presentation of an arrest warrant, a warrant to convey and/or an order of the Cuyahoga County Juvenile Court in violation of, inter alia, Detention Center policy. Tr. p. 33, l. 11-19; p. 105, l. 11-20; p. 108, l. 11-18; p. 176, l. 18-25; p. 177, l. 1-5; p. 178, l. 3-17; p. 182, l. 6-24; p. 184, l. 8-17; p. 185, l. 11-25; and p. 186, l. 1-3. See also, State's Exhibit No. 2. See also, Defense Exhibits B and D. At the time the Detective removed the juvenile from the Detention Center, the child was in his (the Detective's) custody. Tr. p. 40, l. 17-19; p. 69, l. 1-4; p. 112, l. 6-11 and 20-21; and p. 150, l. 2-8. See also, State's Exhibit No. 2.

Upon exiting the Detention Center, Sgt. Shoulders placed the alleged delinquent in the back of a police car and took him to the City Jail at the Justice Center for processing on the Black Ford Fusion receiving stolen property charge. Tr. p. 42, l. 15-25; p. 43, l. 1-2; p. 113, l. 18-20; p. 114, l. 16-18; p. 116, l. 5-7; and p. 117, l. 1-5. During the trip to the Justice Center, the child , according to the Detective, asked why he was being taken to the City Jail. Tr. p. 43, l. 8-16; p. 116, l. 8-10; p. 117, l. 1-5; p. 121, l. 3-10; and p. 142, l. 9-14. In response, the Detective explained that he was taking the juvenile to the Justice Center to be processed on several aggravated robbery cases. Id. This response contravened the Detective's stated reasoning for removing the child from the Detention Center.

At the Justice Center, the alleged delinquent, according to Sgt. Shoulders, again inquired as to why he was being brought to the City Jail. Tr. p. 47, l. 6-15. It was at this point that the Detective was more explicit in his explanation. Tr. p. 47, l. 6-15; p. 123, l. 14-25; p. 124, l. 1-18; and p. 125, l. 2-16. Specifically, the Detective told the child that he was being processed "for our criminal investigation". Id. The Detective also told him that the two other males, who were arrested with him, had given the police information that he (the child) was involved in the Black Ford Fusion aggravated robbery investigation. Id. The Detective testified during the March 2nd hearing that this last statement, however, was not true. Tr. p. 125, l. 22-25; p. 126, l. 1-25; p. 127, l. 1; and p. 144, l. 10-13. He (the Detective) was being deceptive. Id. In response to the Detective's more detailed, but deceptive, explanation, the child made several statements in the presence of law enforcement relative to the afore-mentioned investigation. Tr. p. 43, l. 17-24; p. 49, l. 20-25; p. 50, l. 1-6; p. 127, l. 24-25; p. 128, l. 1-2; and p. 142, l. 2-8.

Subsequent to processing the alleged delinquent at the Justice Center, Sgt. Shoulders transported the child to the Second District police station to be interrogated relative to his (the Detective's) Black Ford Fusion aggravated robbery investigation. Tr. p. 50, l. 22-25; p. 51, l. 1-5 and 25; p. 52, l. 1-2 and 11-15; p. 56, l. 20-22; p. 128, l. 3-6; and p. 131, l. 20-24. See also, State's Exhibit No. 3. The interrogation was held in the Detective's office in the presence of several police officers for approximately three (3) hours. Id. At some point during the interrogation, one (1) of the police officers read the child his Miranda rights and recorded his (the child's) statement. Tr. p. 61, l. 11-16; p. 66, l. 21-24; p. 139, l. 17-25; and p. 140, l. 1-2. See also, State's Exhibit No. 3. At no time while he was at the Second District police station, was the child allowed to speak with his attorney, his mother and/or any other family member. Tr. p. 144, l. 21-25 and p. 145, l. 1. Once the Second District interrogation was concluded, the child was transported back to the Detention Center by the police. Tr. 67, l. 19-23. See also, State's Exhibit No. 2. See also, Defense Exhibit D. Unbeknownst to the Public Defender or the assigned jurist, the child was absent from the Detention Center for approximately five (5) hours on September 1, 2015. Tr. p. 132, l. 18-25; p. 133, l. 1-25; p. 134, l. 1-9; and p. 135, l. 1-13. See also, State's Exhibit No. 2. See also, Defense Exhibit D.

Based on the information obtained during the September 1st Second District interrogation, the State filed a new nine (9) count Complaint against the alleged delinquent in case No. DL15113409--the matter currently before the Court--on September 24, 2015.

IV.  Statement of the Procedural Facts

On August 31, 2015, the State of Ohio filed a two (2) count Complaint against the alleged delinquent in case No. DL15111991. The August 31st Complaint alleged that the child had committed the crimes of Receiving Stolen Property, a felony of the fourth degree, in violation of RC Section 2913.51 (Count 1) and Obstructing Official Business, a misdemeanor of the second degree, in violation of RC Section 2921.31 (Count 2). The Complaint in case ending 991 involved a Black Ford Fusion.

On August 31, 2016, the alleged delinquent was arraigned by the Cuyahoga County Juvenile Court Detention Center Magistrate on the August 31st Complaint. See, Clerk's Journal at vol. 113, p. 79 on September 3, 2015. The PDs Office was appointed by the Court to represent the child in case ending 991. Id. At the conclusion of the August 31st hearing, the child was remanded by the Magistrate back to the Cuyahoga County Juvenile Court Detention Center (hereinafter, at times, referred to as the "Detention Center") pending further proceedings in the matter. Id.

On September 24, 2015, the State filed a nine (9) count Complaint against the alleged delinquent in case No. DL15113409. The September 24th Complaint alleged that the child committed the crimes of Aggravated Robbery, a felony of the first degree, in violation of RC Section 2911.01(A)(1) with a one (1) year firearm specification in violation of RC Section 2941.141(A) and a three (3) year firearm specification in violation of RC Section 2941.145(A) (Counts 1 and 2); Kidnapping, a felony of the first degree, in violation of RC Section 2905.01(A)(2) with a one (1) year firearm specification in violation of RC Section 2941.141(A) and a three (3) year firearm specification in violation of RC Section 2941.145(A) (Counts 3 and 4); Robbery, a felony of the second degree, in violation of RC Section 2911.02(A)(2) with a one (1) year firearm specification in violation of RC Section 2941.141(A) and a three (3) year firearm specification in violation of RC Section 2941.145(A) (Counts 5 and 6); Receiving Stolen Property, a felony of the fourth degree, in violation of RC Section 2913.51(A) (Count 7); Grand Theft, a felony of the fourth degree, in violation of RC Section 2913.02 (A)(1) (Count 8); and Obstructing Official Business, a misdemeanor of the second degree, in violation of RC Section 2921.31 (Count 9). Case ending 409 also involved a Black Ford Fusion.

On October 2, 2016, the alleged delinquent was arraigned by the Detention Center Magistrate on the September 24th Complaint. See, Clerk's Journal at vol. 114, page 4779 on October 7, 2015. The PDs Office was appointed by the Court to represent the child in case ending 409--the case currently pending before the

Court.  Id.  At the conclusion of the October 2nd hearing, the child was remanded by the Magistrate to the Detention Center pending further proceedings in the matter.  Id.

On October 6, 2015, the State filed its Motion for Order to Relinquish Jurisdiction for the Purpose of Criminal Prosecution Pursuant to R.C. 2152.10(B) and for Preliminary Hearing (hereinafter referred to as either the "October 6th Motion" or the "Bindover Motion") in case ending 409.  On January 20, 2016, a hearing was held on the October 6th Motion.  See, Clerk's Journal at vol. 119, p. 748 on January 27, 2016.  On January 22, 2016, the Bindover Motion was denied by the Court.  See, Clerk's Journal at vol. 119, p. 876 on January 27, 2016.  An adjudicatory hearing in the matter was set for February 17, 2016 by the assigned jurist.  Id.

On October 16, 2015, case ending 991 was dismissed without prejudice as the State of Ohio had re-filed the matter as case No. DL15113409.  See, Clerk's Journal at vol. 114, p. 9388 on October 20, 2015.

On February 17, 2016, the Public Defender, on behalf of the alleged delinquent, filed her Motion to Suppress Illegally Obtained Statements & Evidence (hereinafter referred to as either the "February 17th Motion" or the "Suppression Motion") in case ending 409.  The February 17th Motion contended that the police's actions on September 1, 2015 violated the child's rights under the Fourth, Fifth, Sixth and Fourteenth Amendments to the U.S. Constitution (hereinafter referred to as the "Fourth Amendment", the "Fifth Amendment", the "Sixth Amendment" and  the "Fourteenth Amendment", respectively) and Article I, Sections 10 and 16 of the Constitution of the State of Ohio (hereinafter referred to as the "Ohio Constitution").

On February 29, 2016, the Prosecuting Attorney, on behalf of the State, filed the State of Ohio's Response in Opposition to Alleged Delinquent's Motion to Suppress (hereinafter referred to as either the "February 29th Response" or the "Response") in case ending 409.  The February 29th Response asserted that the police did not violate the child's constitutional rights on the date-in-question and, as such, the child's September 1st statement to the police should not be suppressed or excluded from the trial in the instant matter.

On March 2, 2016, a suppression hearing was held by the Court in case ending 409.  See, Clerk's Journal at vol. 120, p. 7564 on March 3, 2016.  Testimony was heard by the Court.  Id.  The matter was submitted at the conclusion thereof for the Court's consideration.  Id.

The instant matter is before the Court to determine the sufficiency of the February 17th Motion.

V.  Opinion

    A.  The February 17th Motion was filed in accordance with the Ohio Rules of Juvenile Procedure and, therefore is properly before the Court.

Pursuant to Rule 22(D)(3) of the Ohio Rules of Juvenile Procedure (hereinafter referred to as either "Juv.R." or the "juvenile rules"), a motion to suppress evidence on the grounds that such evidence was illegally obtained must be filed and heard prior to trial.  Challenges related to an illegally obtained confession/statement fall within this category of required pre-trial motions.  See, e.g., Juv.R. 22(D)(3).

Consistent with Juv.R. 19, 22(D)(3) and 22(E), a suppression motion must be filed at the later of seven (7) days prior to the hearing or ten (10) days after the appearance of counsel.  On October 2, 2015, the PDs Office was appointed by the Court to represent the child in case ending 409.  See, Clerk's Journal at vol. 114, p. 4779 on October 27, 2015.  The PDs Office made its first appearance on behalf of the child before the Court on the same date.  Id.

On February 17, 2016, the child, through counsel, filed his Suppression Motion.  At the time the February 17th Motion was filed, the matter had been set for adjudication by the assigned jurist.

The Court, pursuant to Juv.R. 22(D), may, for good cause shown, permit a motion to suppress evidence to proceed under Juv.R. 22(D)(3) at the time the evidence is offered.  The Court finds that the February 17th Motion was not filed within the time allowed by the juvenile rules.  For good cause shown, however, the Court does hereby allow the Suppression Motion to proceed as there was no objection to the Public Defender's February 4, 2016 Motion for Continuance which was granted by the Court.  See, Clerk's Journal at vol. 120, p. 1506 on February 22, 2016.  As such, the Court finds that the Suppression Motion is properly before the Court at this time; thereby, allowing the Court to hear and dispose of same prior to trial.  Juv.R. 22(D)(3).

B. **The alleged delinquent was unlawfully seized from the Detention Center by Sgt. Shoulders on September 1, 2015 in violation of the Fourth and Fourteenth Amendments.**

The Fourth Amendment governs the circumstances under which a person may be seized by law enforcement. The Amendment provides:

> The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

This right was made applicable to the states via the Fourteenth Amendment. Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed. 2d 1081 (1961). Similar language is found in Article I, Section 14 of the Ohio Constitution. As such, the standards of reasonableness and probable cause govern both federal and state criminal matters. Ker v. State of California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed. 2d 726 (1963).

It follows that as a general proposition, a person may only be seized by law enforcement where probable cause is found to exist. See, Fourth Amendment. See also, State v. Mendell, 2010-Ohio-6107, 2010 WL 5140453 (Ohio Appellate 2nd Dist. Montgomery County 2010). Where probable cause does exist, a warrant must issue for the individual's arrest. Id. See, State v. Mendell, supra (a warrant based on probable cause must be issued prior to an arrest of the arrest to be valid). See also, Rules 3 and 4 of the Ohio Rules of Criminal Procedure (hereinafter referred to as either "Crim.R." or the "criminal rules").

The requirement of probable cause has roots that are deep in American history. Dunaway v. New York, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed. 2d 824 (1979). Hostility to seizures based on mere suspicion was a prime motivation for the adoption of the Fourth Amendment. Id. Moreover, the decisions immediately after the Amendment's adoption affirmed that common rumor or report, suspicion, or even a strong reason to suspect was not adequate to support an arrest warrant. Id.

A person is seized within the meaning of the Fourth and Fourteenth Amendments when taking into account the circumstances surrounding the encounter, the conduct of the police communicates to a reasonable person that he is not at liberty to ignore the police's presence and to go about his (the reasonable person's) business. Kaupp v. Texas, 538 U.S. 626, 123 S.Ct. 1843, 155 L.Ed. 2d 814 (2003). See also, California v. Hodari D., 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed. 2d 690 (1991) (a person has been seized within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would believe that he or she is not free to leave). In the context of a seizure within the meaning of the Fourth Amendment, this test is an objective one. Id. See also, California v. Hodari D., supra.

A seizure is equivalent to an arrest. State v. Franklin, 86 Ohio App. 3d 101, 1993 Ohio App. LEXIS 497, 619 N.E. 2d 1182 (Ohio Appellate 1st Dist. Hamilton County 1993). By definition, such a seizure requires either physical force or the person's submission to an assertion of authority. Id. See also, State v. Gaddis, 35 Ohio App. 2d 15, 64 Ohio Op. 2d 143, 1973 Ohio App. LEXIS 841, 299 N.E. 2d 304 (Ohio Appellate 12th Dist. Butler County 1973) (an arrest is the taking, seizing or detaining of the person, either by touching or putting hands on him, or by an act which indicates an intention to take him into custody and subjects the person arrested to the actual control and will of the person making the arrest).

In the instant matter, the alleged delinquent was arrested by the CMHA police relative to a stolen Black Ford Fusion on August 28, 2015. See, Tr. p. 28, l. 22-25; p. 29, l. 1-7; p. 85, l. 21-24; p. 86, l. 8-9; p.87, l. 6-25; p. 88, l. 1-15; p. 89, l. 22-25; p. 90, l. 1-10 and 22-25; and p. 91, l. 1-4. Upon his arrest, the child was transported to the Cuyahoga County Juvenile Court Detention Center, i.e., secure detention, where he was held pending further proceedings with respect thereto. Tr. p. 29, l. 8-15 and 22-25; and p. 30, l. 1.

On August 31, 2015, the State of Ohio filed a two (2) count Complaint against the alleged delinquent in case No. DL15111991. The August 31st Complaint alleged that the child had committed crimes relative to the afore-mentioned Black Ford Fusion. See, Tr. p. 95, l. 22-24. On the same date, the child was arraigned by the Detention Center Magistrate relative to the August 31st Complaint. See, Clerk's Journal at vol. 113, p. 79 as journalized on September 3, 2015. See also, Defense Exhibit C. The PDs office was appointed by the Court to represent the child in case ending 991. Id. At the conclusion of the August 31st hearing, the child was remanded by the Magistrate back to the Detention Center pending further proceedings in the matter. Id. See also, Tr. p. 95, l. 25 and p. 96, l. 1-3. It follows that on September 1, 2015, the child was in the custody of the Cuyahoga County Juvenile Court.

On or about August 28, 2015, Sgt. Shoulders was assigned to investigate, among other crimes, an

aggravated robbery involving the Black Ford Fusion which was the subject vehicle in case ending 991.  Tr. p. 28, l. 22-25; p. 29, l. 1-11; p. 85, l. 21-24; and p. 87, l. 6-22.  The Detective's investigation revealed that the vehicle had been found and that one (1) of the suspects with respect thereto was a juvenile being held in the Detention Center.  Tr. p. 28, l. 22-25; p. 29, l. 1-55; p. 30, l. 1; p. 85, l. 21-24; p. 87, l. 6-25; p. 88, l. 1 and 10-13; p. 89, l. 22-25; p. 90, l. 1-10 and 22-25; p. 91, l. 1-4; p. 96, l. 17-25; p. 97, l. 3-11; p. 98, l. 7-13; p. 101, l. 15-25; and p. 102, l. 1-17.  <u>See</u> also, Defense Exhibit A.  The suspect juvenile had not been processed by the Police Department relative to the Black Ford Fusion receiving stolen property charge.  Tr. p. 29, l. 12-25 and p. 30, l. 1.

On September 1, 2015, the day after the alleged delinquent was arraigned on the Complaint in case ending 991 and assigned counsel to represent him with respect thereto, Sgt. Shoulders presented to the Detention Center to retrieve the child for "processing purposes" relative to the Black Ford Fusion receiving stolen property charge.  Tr. p. 36, l. 11-12; p. 106, l. 18-24; p. 107, l. 22-25; and p. 108, l. 1-10.  <u>See</u> also, State's Exhibit No. 2.  The Detective had neither a warrant for the child's arrest nor a warrant to convey the child nor an order from a jurist of the Cuyahoga County Juvenile Court allowing him to remove the child from the Detention Center for any purpose.  Tr. p.33, l. 11-19; p. 105, l. 1-20; p. 108, l. 11-18; p. 176, l. 18-25; p. 177, l. 1-5; p. 178, l. 3-17; p. 182, l. 6-24; p. 184, l. 8-17; p. 185, l. 11-25; and p. 186, l. 1-3.  <u>See</u> also, State's Exhibit No. 2.  <u>See</u> also, Defense Exhibits B and D.

A review of State's Exhibit No. 2 reveals that the alleged delinquent, upon being brought to Sgt. Shoulders by Detention Center staff, turned around and placed his hands behind his back.  <u>See</u>, State's Exhibit No. 2.  <u>See</u> also, Tr. p. 40, l. 17-25; p. 111, l. 7-25; p. 112, l. 1-25; and p. 113, l. 1-16.  Thereby, allowing the Detective to handcuff him (the child) without incident.  <u>Id</u>.  Upon handcuffing the child, the Detective placed one hand on the child's shoulder, the other on his handcuffs, and walked the child out of the Detention Center.  <u>Id</u>.

As part of the March 2nd hearing, Sgt. Shoulders admitted that at the point where the alleged delinquent was delivered to him by Detention Center staff, the child went from being in the custody of the Cuyahoga County Juvenile Court to being in his (the Detective's) custody.  Tr. p. 40, l. 17-25; p. 111, l. 7-25; p. 112, l. 1-25; and p. 113, l. 1-16.  At no time during this initial encounter did the Detective <u>Mirandize</u> the child.  Tr. p. 61, l. 11-16.  <u>See</u> also, State's Exhibit No. 3.

Utilizing the test set forth in <u>Kaupp</u> and its progeny, the Court finds that the alleged delinquent was "seized" by Sgt. Shoulders within the meaning of the Fourth and Fourteenth Amendments.  <u>Kaupp v. Texas</u>, <u>supra</u>; <u>California v. Hodari D.</u>, <u>supra</u>.  Once the Detective handcuffed the child, placed his hand on the child's shoulder and walked him (the child) out of the Detention Center, the child was not, by any stretch of the imagination, free to go about his business.  <u>Kaupp v. Texas</u>, <u>supra</u>; <u>California v. Hodari D.</u>, <u>supra</u>.  <u>See</u>, State's Exhibit No. 2.  <u>See</u> also, Tr. p. 40, l. 17-25; p. 111, l. 7-25; p. 112, l. 1-25; and p. 113, l. 1-16.  The Court further finds that no reasonable person under these circumstances would believe that he or she did not have to go with the Detective.  <u>Id</u>.  The Court notes the fact that the child did not resist the Detective's assertion of authority over him is not dispositive of the issue, <u>i.e.</u>, it does not mean that the child went with the Detective voluntarily.  <u>Kaupp v. Texas</u>, <u>supra</u> (there is no reason to think Kaupp's answer was anything more than a mere submission to a claim of lawful authority).  The child, presented with the Detective's claim of lawful authority as sanctioned by Detention Center staff, had no choice, but to accompany the Detective.  Tr. p. 36, l. 11-12; p. 106, l. 18-24; p. 107, l. 22-25; and p. 108, l. 1-10.  <u>See</u> also, State's Exhibit No. 2.

The Court finds that this seizure amounted to an arrest of the alleged delinquent by Sgt. Shoulders.  <u>State v. Franklin</u>, <u>supra</u>; <u>State v. Gaddis</u>, <u>supra</u>.  <u>See</u> also, State's Exhibit No. 2.  As such, the Detective was required to present, at a minimum, a warrant for the child's arrest.  <u>See</u>, Fourth and Fourteenth Amendments.  <u>See</u> also, <u>Dunaway v. New York</u>, <u>supra</u>; <u>State v. Mendell</u>, <u>supra</u>.  No arrest warrant, a warrant to convey or order of the Cuyahoga County Juvenile Court, however, was presented by the Detective authorizing him to remove the child from the Detention Center.  Tr. p.33, l. 11-19; p. 105, l. 1-20; p. 108, l. 11-18; p. 176, l. 18-25; p. 177, l. 1-5; p. 178, l. 3-17; p. 182, l. 6-24; p. 184, l. 8-17; p. 185, l. 11-25; and p. 186, l. 1-3.  <u>See</u> also, State's Exhibit No. 2.  <u>See</u> also, Defense Exhibits B and D.

The State of Ohio theorizes that the alleged delinquent's removal from the Detention Center did not violate the Fourth and Fourteenth Amendments.  Rather, it was for "processing purposes" on the Black Ford Fusion receiving stolen property charge which is, according to the State, a legitimate reason under the law.  <u>See</u>, Tr. p. 42, 15-25 and p. 43, l. 1-2 and 8-24.  The Court finds that this theory is not credible for the following reasons:

   a. Sgt. Shoulders was investigating an alleged aggravated robbery of the "receiving stolen property Black Ford Fusion".  Tr. p. 28, l. 22-25; p. 29, l. 1-11; p. 85, l. 21-24; and p. 87, l. 6-22.  This investigation was admittedly distinct from the Black Ford Fusion receiving stolen property charge.  Tr. p. 43, l. 25

and p. 44, l. 1-2.

b. The Detective was aware that the alleged delinquent was being held in the Detention Center relative to a receiving stolen property charge involving the same Black Ford Fusion. Tr. p. 95, l. 25; p. 96, l. 1-3; p. 98, l. 7-13; p. 101, l. 15-25; and p. 102, l. 1-17.

c. The Detective was also aware that the Black Ford Fusion, which was the subject of case ending 991, was the same vehicle which was the focus of his aggravated robbery investigation. Tr. p. 101, l. 15-25 and p. 102, l. 1-17. In other words, there was an absolute connection between the two (2) matters. Id.

d. The Detective admittedly removed the child from the Detention Center for the purpose of following up on, among other things, his aggravated robbery investigation relative to the Black Ford Fusion, not for processing on the Black Ford Fusion receiving stolen property charge. Tr. p. 42, l. 15-25; p. 43, l. 1-2 and 8- 24; p. 47, l. 6-15; and p. 121, l. 3-10.

e. As part of his investigation, the Detective admittedly wanted the juvenile's fingerprints and a "current", i.e., within six (6) months, photograph of the child to put in a photo line-up. Tr. p. 95, l. 6-8 and 19-24; p. 99, l. 9-18; p. 104, l. 3-8; p. 121, l. 16-20 and p. 122, l. 15-17.

f. The Detective was aware that the alleged delinquent had been processed by the Police Department earlier in 2015. Tr. p. 92, l. 8-17 and p. 93, l. 13-16. The Detective was also aware that the police had in its possession a photograph of the child. Id.

g. At the time the alleged delinquent was removed from the Detention Center, the Detective had not spoken with the child's adult co-defendants in the Black Ford Fusion receiving stolen property case. Tr. p. 126, l. 10-18. In fact, as of the March 2nd hearing, the Detective had still not obtained a statement from either of them. Tr. p. 126, l. 19-23.

h. Because the Detective had not spoken with the alleged delinquent's adult co-defendants in the Black Ford Fusion receiving stolen property case nor obtained a statement from them, he admittedly deceived the juvenile into believing that they had implicated him (the child) in the Black Ford Fusion aggravated robbery matter. Tr. p. 47, l. 6-15; p. 123, l. 14-20; p. 124, l. 9-18; p. 125, l. 2-25; p. 126, l. 1-9 and 24-25; and p. 127, l. 1.

i. The Detective also admittedly wanted to elicit a response from the child relative to the Black Ford Fusion aggravated robbery investigation for the purpose of clearing up some things for the police "down the road". Tr. p. 127, l. 13-18.

Given these factors, the Court finds that the State's theory is based on a pretext or rouse perpetrated by Sgt. Shoulders. The Detective's actions and knowledge, as detailed herein, strongly suggest that he had a hidden agenda from the beginning, i.e., to obtain information pertaining to his Black Ford Fusion aggravated robbery investigation. While the Detective may have suspected the alleged delinquent's involvement therein, he (the Detective) did not have probable cause to link the juvenile thereto or to arrest him thereon. Thus, the reason the Detective intentionally circumvented the protections of the Fourth and Fourteenth Amendments.[i]

1. The alleged delinquent's unlawful seizure on September 1, 2015 violated established Detention Center policy and, therefore, the Fourth and Fourteenth Amendments.

The Detention Center requires, among other things, that a police officer, who wishes to remove a juvenile therefrom, present an arrest warrant or a warrant to convey to Detention Center staff. Tr. P. 178, 8-21; p. 185, l. 11-25; p. 186, l. 1-3. In the alternative, the Detention Center will accept an order from the Cuyahoga County Juvenile Court releasing the child to the officer. Id. Such documents must be attached to an Out-of-Building Pass and placed in the juvenile's resident file. Tr. p. 184, l. 8-17; p. 185, l. 17-25; and p. 186, l. 1-3. If these documents are not attached to the Out-of-Building Pass, the child cannot be removed from the Detention Center. Tr. p. 187, l. 7-13; p. 189, l. 10-13; p. 201, l. 13-23; p. 202, l. 6-17; p. 203, l. 6-25; and p. 204, l. 1-7. Moreover, once the juvenile is removed from the Detention Center, this occurrence must be documented in, among other places, the Cuyahoga County Juvenile Court's computer system. Tr. p. 182, l. 10-24.

In the instant matter, the child was arraigned by the Detention Center Magistrate in case ending 991 on August 31, 2015. See, Clerk's Journal at vol. 113, p. 79 as journalized on September 3, 2015. At the

conclusion of the August 31st arraignment, the child was remanded by the Magistrate back to the Detention Center pending further proceedings therein. Id. See also, Tr. p. 95, l. 25 and p. 96, l. 1-3. It follows that on September 1, 2015, the child was in the custody of the Cuyahoga County Juvenile Court and, therefore, subject to its rules and regulations. Tr. p. 178, l. 22-25. See also, Defense Exhibit C.

On September 1, 2015, Sgt. Shoulders presented to the Detention Center to retrieve the alleged delinquent under the pretext of "processing" him (the child) relative to the Black Ford Fusion receiving stolen property charge. Tr. p. 36, l. 11-12; p. 106, l. 18-24; p. 107, l. 22-25; and p. 108, l. 1-10. See also, State's Exhibit No. 2. The Detective had no arrest warrant, no warrant to convey and/or no order from the Cuyahoga County Juvenile Court allowing him to remove the child therefrom. Tr. p.33, l. 11-19; p. 105, l. 1-20; p. 108, l. 11-18; p. 176, l. 18-25; p. 177, l. 1-5; p. 178, l. 3-17; p. 182, l. 6-24; p. 184, l. 8-17; p. 185, l. 11-25; and p. 186, l. 1-3. See also, State's Exhibit No. 2. See also, Defense Exhibits B and D.

The Court finds that Sgt. Shoulder's knowing failure to follow established Detention Center policy was a violation thereof. Despite this failure, the Detective was allowed to remove the alleged delinquent therefrom. Tr. p. 182, l. 6-13. See also, State's Exhibit No. 2.

The State of Ohio asserts that as it relates to Sgt. Shoulder's actions on September 1, 2015, any violation of Detention Center policy was de minimus as it was not his responsibility to ensure compliance therewith. In other words, the Detective should not be held responsible for the Detention Center staff's failure to follow protocol. The Court finds this assertion not credible for the following reasons:

a. As discussed in Section V(B) above, Sgt. Shoulder's actions on September 1, 2015 were a pretext or rouse for his real purpose, i.e., to obtain information pertaining to his Black Ford Fusion aggravated robbery investigation. As such, he was looking for a way to get the child alone for the purpose of eliciting a response from him relative to said investigation. Tr. p. 127, l. 13-18.

b. The Detective was aware of Detention Center policy requiring an arrest warrant, a warrant to convey and/or an order from the Cuyahoga County Juvenile Court in order to remove the alleged delinquent therefrom. Tr. p. 108, l. 11-20.

c. Prior to or on September 1, 2015, the Detective called the Detention Center attempting to secure the child's release. Tr. p. 30, l. 6-10; p. 31, l. 25; p. 32, l. 1-8; and p. 105, l. 11-20. His first three (3) attempts were unsuccessful, i.e., he was "blown off". Id. Specifically, the Detective was told by these individuals that "they had to talk to their supervisor to find out if that was ok", i.e., whether his request was consistent with established Detention Center policy. Id.

d. The Detective admitted that as a result of these encounters, he was frustrated with the whole system. Tr. p. 31, l. 25; p. 32, l. 1-23; and p. 33, l. 11-19. On his fourth attempt, however, he got "ahold of somebody that seemed to have some intelligence" who acquiesced to his request. Id.

e. This "intelligent" person allowed the Detective to remove the alleged delinquent from the Detention Center in violation of established Detention Center policy. Tr. p. 33, l. 11-19 and p. 105, l. 11-20.

f. According to the Detective, the child's removal in this manner was consistent with his past experience. Tr. 108, l. 1-8. It was also consistent with the legal advice he received from the Prosecuting Attorney's Office. Tr. p. 106, l. 18-24; p. 107, l. 22-25; p. 108, l. 1-10; p. 110, l. 3-16; p. 154, l. 18-25; p. 155, l. 1-3; p. 161, l. 4-25; p. 162, l. 1-13; p. 163, l. 11-23; and p. 164, l. 8-25.

g. The alleged delinquent's September 1, 2015 release to the Detective was not documented, as required by Detention Center policy, in the Cuyahoga County Juvenile Court computer system. Tr. p. 182, l. 10-24; p. 194, l. 19-25; and p. 195, l. 1-10.

h. The September 1, 2015 Out-of-Building Pass was not filed in the alleged delinquent's resident file as required by Detention Center policy. Tr. p. 183, l. 5-25 and p. 184, l. 1-7. See also, Defense Exhibit D. Upon the discovery thereof in February 2016, however, the Pass contained only an initial release signature. Tr. p. 194, l. 19-25 and p. 195, l. 1-10. See also, Defense Exhibit D. There was no return signature. Id.

i. The fact that the alleged delinquent was removed from the Detention Center on September 1, 2015 was kept secret for approximately five (5) months. Tr. p. 197, l. 12-25 and p. 198, l. 1.

Given these factors, the Court finds that consistent with the discussion detailed in Section V(B) above, Sgt.

Shoulders' stated reasoning for wanting to remove the alleged delinquent from the Detention Center was a pretext or rouse. The Detective was focused on securing evidence that would help him close his Black Ford Fusion aggravated robbery investigation.

Understanding that established Detention Center policy required certain legal paperwork to remove a juvenile therefrom (Tr. p. 108, l. 11-20), Sgt. Shoulders needed someone who knew and understood the system. This "intelligent" individual would assist him in removing the alleged delinquent from the Detention Center without the proper paperwork.

Frustrated by the first three (3) Detention Center staffers he spoke with (Tr. p. 30, l. 6-10; p. 31, l. 25; p. 32, l. 1-8; and p. 105, l. 11-20), Sgt. Shoulders finally got "ahold of somebody that seemed to have some intelligence". Tr. p. 31, l. 25; p. 32, l. 1-23; and p. 33, l. 11-19. This statement by the Detective underscores the rouse knowingly perpetrated in this matter by him. It also undercuts the State's de minimus or clerical error argument.

The Court further finds that the concealment of the alleged delinquent's removal from the Detention Center on September 1, 2015 was part and parcel of Sgt. Shoulder's rouse. The concealment was intentional. It allowed the Detective to unlawfully interrogate the child without the knowledge of the Court, the child's attorney and/or his mother. The concealment also allowed the Detective to extract an illegal statement from the child implicating not only himself, but possibly his adult co-defendants.

The Court further finds that the September 1, 2015 concealment of the alleged delinquent's Detention Center removal was not de minimus or a clerical error. It was an intentional violation of established Detention Center policy. It was also an intentional violation of the child's rights under, inter alia, the Fourth and Fourteenth Amendments.

    2.  <u>Any and all evidence obtained by law enforcement on September 1, 2015 or as a result thereof must be suppressed as the fruit of the poisonous tree.</u>

The principal remedy for violating an individual's Fourth Amendment rights is the exclusion of evidence from her or his criminal trial. Under the Exclusionary Rule, evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure. <u>Mapp v. Ohio</u>, <u>supra</u>. This includes the "fruit" of such illegal conduct. This Rule was fashioned to as a sanction to deter and redress overreaching governmental action prohibited by the Fourth Amendment. <u>Davis v. Mississippi</u>, 394 U.S. 721, 724, 89 S.Ct. 1394, 22 L.Ed. 2d 676 (1969).

The Exclusionary Rule applies to statements made even after <u>Miranda</u> warnings are given where a violation of the Fourth Amendment is found to exist. <u>Dunaway v. New York</u>, <u>supra</u>. The U.S. Supreme Court opined that "If <u>Miranda</u> warnings, by themselves, were held to attenuate the taint of an unconstitutional arrest, regardless of how wanton and purposeful the Fourth Amendment violation, the effect of the [E]xclusionary [R]ule would be substantially diluted…. Arrests made without warrant or without probable cause, for questioning or 'investigation,' would be encouraged by the knowledge that evidence derived therefrom could well be made admissible at trial by the simple expedient of giving <u>Miranda</u> warnings." <u>Id</u>. at 839. <u>See also</u>, <u>Oregon v. Elstad</u>, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed. 2d 222 (1985) (evidence and witnesses discovered as a result of a search in violation of the Fourth Amendment must be excluded where the violation results in an illegal confession or statement).

Similarly, the Exclusionary Rule applies to fingerprints taken in violation of the Fourth Amendment. <u>Davis v. Mississippi</u>, <u>supra</u> at 724. The U.S. Supreme Court stated in its opinion that the Fourth Amendment applies to the investigatory stage of a criminal investigation. <u>Id</u>. at 726. If it did not, "[i]nvestigatory seizures would subject unlimited numbers of innocent persons to harassment and ignominy incident to involuntary detention. Nothing is more clear than that the Fourth Amendment was meant to prevent wholesale intrusions upon the personal security of our citizenry, whether these intrusions be termed 'arrests' or 'investigatory detentions'." <u>Id</u>. at 726-727.

It follows that consistent with this discussion, the fingerprints and statement obtained from the alleged delinquent on September 1, 2015 must be excluded from the trial in the case <u>sub judice</u> as the fruit of the poisonous tree. It also follows that the child's photograph taken on the same date must also be excluded as the fruit of the poisonous tree as part of the Black Ford Fusion aggravated robbery investigation.

    C.  <u>Sgt. Shoulders' September 1, 2015 interrogation violated the alleged delinquent's Fifth Amendment right against self-incrimination.</u>

The Fifth Amendment privilege against self-incrimination governs the admissibility of statements made by

an individual. Specifically, the Fifth Amendment provides that no person "be compelled in any criminal case to be a witness against himself." Similar language is found in Article I, Section 10 of the Ohio Constitution.

The privilege, however, does not proscribe the admissibility of all statements. Rather, the privilege "'protects a person only against being incriminated by his own compelled testimonial communications.'" Doe v. U.S., 487 U.S. 201, 207, 108 S.Ct. 2341, 101 L.Ed. 2d 184 (1988) (quoting Fisher v. U.S., 425 U.S. 391, 409, 96 S.Ct. 1569, 48 L.Ed. 2d 39 (1976)). It follows that a statement that is not the product of "government compulsion" is not subject to the Fifth Amendment protection against self-incrimination. This right was made applicable to the states via the Fourteenth Amendment. Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed. 2d 653 (1964).

The most common ground for suppressing a person's statement(s) is a violation of the rules promulgated in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed. 2d 694 (1966). In Miranda v. Arizona, the U.S. Supreme Court opined that a custodial interrogation generates "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he does not otherwise do so freely." Id. The government, therefore, may not use statements elicited through a custodial interrogation unless the use of procedural safeguards guarantee that the person has been informed of and has freely waived his Fifth Amendment rights. Id.

The rule established in Miranda v. Arizona affects only the admissibility of statements obtained as the result of a "custodial interrogation." Rhode Island v. Innis, 466 U.S. 291, 100 S.Ct. 1682, 64 L.Ed. 2d 297 (1980). A custodial interrogation consists of "questioning initiated by [a] law enforcement [officer] after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Miranda v. Arizona, supra at 444.

Prior to claiming the protections espoused in Miranda, the individual must meet two (2) threshold requirements. First, the statement must be made while in the custody of a law enforcement official. See, Thompson v. Keohane, 516 U.S. 99, 116 S.Ct. 457, 133 L.Ed. 2d 383 (1995). Second, the statement is made in response to a government interrogation. See, Rhode Island v. Innis, supra at 300.

A person is in custody if a reasonable person in the same situation would freely terminate the interrogation. See, Thompson v. Keohane, supra at 112. See also, In the matter of K.W., 2009 WL 1845240 (Ohio Appellate 3rd Dist. June 29, 2009). The analysis in this regard first centers on the circumstances surrounding the interrogation. Id. Second, the analysis would consider whether, given those circumstances, a reasonable person would believe that he was not at liberty to terminate the interrogation and leave. Id.

After establishing that the statement was made while in custody, it must be shown that the statement was made in response to a government interrogation. Rhode Island v.Innis, supra at 300. The term "interrogation" is defined as "express questioning" or any activity by the government that is "reasonably likely to elicit an incriminating response." Id. Only actions or questions a law enforcement officer "should know are reasonably likely to elicit an incriminating response from the [individual]" constitute an interrogation. Id.

The protections afforded by the Fifth Amendment and Miranda have been extended to juveniles where applicable. In re: Gault, 387 U.S. 1, 87 S. Ct. 1428, 18 L.Ed. 2d 527 (1967); In the matter of K.W., supra. When a juvenile is subjected to a custodial interrogation, special care must be taken to ensure that her or his constitutional rights are protected. In the matter of K.W., supra.

In deciding whether a juvenile's "confession" is involuntarily induced, the Court must consider the totality of the circumstances. Id. See also, State v. Frazier, 115 Ohio St. 3d 139, 873 N.E. 2d 1263 (2007). Such circumstances include the juvenile's age, mentality and prior criminal experience; frequency, intensity and length of the interrogation; the existence of any physical deprivation or mistreatment; and the existence of any inducement or threat. State v. Frazier, supra; State v. Mason, 82 Ohio St. 3d 144, 694 N.E. 2d 932 (1998); In re: Watson, 47 Ohio St. 3d 86, 548 N.E. 2d 210 (1989); In the matter of K.W., supra. The Court should also consider the absence or presence of the juvenile's legal guardian(s) or parent(s) under such an analysis. In re: Watson, supra at 90.

The State of Ohio contends that the afore-described analysis is unnecessary as the alleged delinquent's September 1, 2015 statement was voluntary. For the reasons discussed below, the Court finds this contention not credible.[ii]

It is uncontroverted that the alleged delinquent's September 1, 2015 statement was made while in the custody of the police. See, State's Exhibit No. 3. The only issue then is whether said statement is "voluntary". For the reasons discussed herein, the Court answers this inquiry in the negative.

Specifically, the alleged delinquent's September 1, 2015 statement was the end goal of the knowing rouse perpetrated by Sgt. Shoulders. This rouse allowed the Detective to unlawfully seize the child from the Detention Center and to put him (the child) in an untenable position without either his attorney, his mother and/or another family member. The circumstances created by the Detective on September 1st gave him the opportunity and time needed to illegally extract the statement from the child as a means of closing the Black Ford Fusion aggravated robbery investigation. Given the Detective's actions on September 1st, no reasonable person could possibly conclude that the statement was "voluntary". On the contrary, the Court finds that the statement was involuntary.**[iii]**

Consistent with the discussion in Section V(B)(2) above, the fact that the alleged delinquent was Mirandized at some point during the September 1, 2015 seizure does not make the statement "voluntary". Dunaway v. New York, supra. The statement is the fruit of the poisonous tree. Id. It was extracted by methods violative of, inter alia, the Fifth and Fourteenth Amendments. Id. See also, Haley v. State of Ohio, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948) (if the undisputed evidence suggests that coercion or force was used to extract a statement, the judgement of conviction cannot be allowed to stand). As such, said statement, per the Exclusionary Rule, must be excluded from the trial in the case sub judice.

> D. Sgt. Shoulders' September 1, 2015 seizure and interrogation violated the alleged delinquent's Sixth Amendment right to counsel.

The Sixth Amendment governs, among other things, an individual's right to counsel. Specifically, the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall * * * * * * have the assistance of counsel for his defense." See also, Article I, Section 10 of the Ohio Constitution. This right was made applicable in all felony cases. Gideon v. Wainwright, 372 U.S. 353, 83 S.Ct. 792, 9 L.Ed. 2d 799 (1963).

In the instant matter, the child was arraigned by the Detention Center Magistrate in case ending 991 on August 31, 2015. See, Clerk's Journal at vol. 113, p. 79 as journalized on September 3, 2015. See also, Defense Exhibit C. Present at the "991 arraignment", among others, was the Prosecuting Attorney's Office. Id. The PDs Office was appointed by the Court to represent the child in the identified case. Id. See also, Defense Exhibit C. At the conclusion of the August 31st hearing, the child was remanded by the Magistrate back to the Cuyahoga County Juvenile Court Detention Center (hereinafter, at times, referred to as the "Detention Center") pending further proceedings in the matter. Id. See also, Defense Exhibit C.

During the March 2nd hearing, Sgt. Shoulders testified that prior to presenting to the Detention Center, the Prosecuting Attorney's Office advised him that he could remove the alleged delinquent therefrom for "processing purposes" without an arrest warrant, a warrant to convey and/or an order of the Cuyahoga County Juvenile Court. Tr. p. 106, l. 18-24;p. 107, l. 22-25; p. 108, l. 1-10; p. 110, l. 3-16; p. 154, l. 18-25; p. 155, l. 1-3; p. 161, l. 4-25; p. 162, l. 1-13; p. 163, l. 11-23; and p. 164, l. 8-25. The Prosecuting Attorney's Office's specific instructions were to "call and have the [alleged] delinquent, * * * [taken] out of his cell and bring him to have him processed, but [the Detective] was not to talk to him [the child] in regards to the incident that occurred", i.e., case ending 991. Id. These instructions were given by the Prosecuting Attorney's Office despite its knowledge that the child was represented by counsel in the identified case. See, Clerk's Journal at vol. 113, p. 79 as journalized on September 3, 2015.

Sgt. Shoulders, however, did not obey these instructions. Tr. p. 47, l. 6-15; p. 123, l. 14-20; p. 124, l. 9-18; p. 125, l. 2-25; p. 126, l. 1-18 and 24-25; and p. 127, l. 13-18. Rather, he utilized the situation to knowingly put the alleged delinquent in an untenable position absent the presence of his attorney. The circumstances created by the Detective on September 1st gave him the opportunity and time needed to illegally extract a statement from the child as a means of closing the Black Ford Fusion aggravated robbery investigation.

The Court finds that the alleged delinquent's Six Amendment right to counsel attached on August 31, 2015. See, Clerk's Journal at vol. 113, p. 79 as journalized on September 3, 2015. See also, Defense Exhibit C. This right was inviolate. As such, Sgt. Shoulders should not have removed the child from the Detention Center, spoken to him and/or taken a statement of any kind without the child's attorney's permission.

As no permission was requested of or received from the child's attorney, Sgt. Shoulders' actions on September 1, 2015 violated the child's rights under the Six Amendment. It follows that any and all evidence obtained as a result of the September 1st unlawful seizure and illegal interrogation must be excluded from the trial in the case sub judice.**[iv]**

VI.  Decision

Based on the foregoing discussion, the February 17th Motion is well taken by the Court. The Motion is, therefore, granted.

It Is Therefore Ordered that the September 1st statement obtained by the police be and is hereby suppressed.

It Is Further Ordered that said statement and any evidence obtained therefrom may not be used by the State of Ohio at the trial of the case <u>sub judice</u> as the fruit of the poisonous tree.

It Is Further Ordered that the photograph of the alleged delinquent taken on September 1, 2015, any photo lineup utilizing the photograph, and any resulting identification stemming from the photo lineup may not be used by the State of Ohio at the trial in the instant matter as the fruit of the poisonous tree.

It Is Further Ordered that the fingerprints of the alleged delinquent obtained on September 1, 2015 and any evidence obtained as a result of said fingerprints may not be used by the State of Ohio at the trial of the case <u>sub judice</u> as the fruit of the poisonous tree.

It Is Further Ordered that this matter be continued until Tuesday, April 26, 2016 at 1:30 p.m. for trial. The parties are hereby given notice that the trial in this matter has also been scheduled for Wednesday, April 27, 2016 at 1:30 p.m. and Thursday, April 28, 2016 at 1:30 p.m. As such, all counsel, parties and their respective witnesses are to be made available for trial on the identified dates. No further order is required at this time.

The child is remanded to the Cuyahoga County Juvenile Court Detention Center pursuant to Juv.R. 7 pending further proceedings in this matter.

---

[i] The Detective's actions also circumvented the protections set forth in Article I, Section 14 of the Ohio Constitution.

[ii] The Court finds, however, that utilizing said analysis, the alleged was unlawfully seized and interrogated by law enforcement on September 1, 2015. <u>See</u>, Discussion set forth in Sections V(B) and V(B)(1). The Court further finds that no reasonable person in the same situation would believe that he or she would have the right to freely terminate the September 1st interrogation. <u>Id</u>. These findings are bolstered by the fact that the child was not allowed to speak with his attorney, his mother and/or any other family member during the September 1st interrogation.

[iii] If the alleged delinquent's September 1, 2015 statement was "voluntary", then why didn't the Prosecuting Attorney's Office advise Sgt. Shoulders to contact the child's attorney; rather, than, as testified to by the Detective (Tr. p. 106, l. 18-24;p. 107, l. 22-25; p. 108, l. 1-10; p. 110, l. 3-16; p. 154, l. 18-25; p. 155, l. 1-3; p. 161, l. 4-25; p. 162, l. 1-13; p. 163, l. 11-23; and p. 164, l. 8-25), advising him to report to the Detention Center without an arrest warrant, a warrant to convey and/or an order of the Cuyahoga County Juvenile Court releasing the child to the Detective? This question and the Detective's actions and knowledge bely the State of Ohio's "voluntary contention". Rather, the question underscores the actual involuntary nature thereof.

[iv] The Court's decision in this regard is bolstered by the fact that the Detention Center has an established policy for contact between law enforcement and its residents. Tr. p. 176, l. 18-25; p. 177, l. 1-25; 178, p. 1-25; p. 179, l. 1-3; p. 196, l. 21-25; and p. 197, l. 1-2. <u>See also</u>, Defense Exhibit B. Specifically, the resident's attorney must be contacted first before law enforcement can speak with the resident. <u>Id</u>. This policy has been in effect since 1988. Tr. p. 205, l. 20-25 and p. 206, l. 1-18. It was crafted under the advice of counsel for the Cuyahoga County Juvenile Court with the protection of the residents' constitutional rights in mind. <u>Id</u>.

Magistrate Retanio Aj Rucker
April 04, 2016
Received for filing, April 04, 2016, Kristin W. Sweeney, ex-officio Clerk,
Court of Common Pleas, Juvenile Division

**<u>Notice to Parties and Counsel</u>:** Pursuant to Juv. R. 40(D)(2)(b) and Civ. R. 53(D)(2)(b), the parties were informed of their right to file with the Court, a Motion to Set Aside the Magistrate's Order not later than ten (10) days after the Magistrate's Order is filed.

Filed with the clerk and journalized by Cuyahoga County Juvenile Court Clerks Office, Volume 122, Page 4041, April 07, 2016, cjpam



**COURT OF COMMON PLEAS**
**JUVENILE COURT DIVISION**
**CUYAHOGA COUNTY, OHIO**

IN THE MATTER OF:

Jayvon Benton

DATE OF BIRTH 10/15/98

CASE NO: DL15111991

JUDGE/MAG. E. Hong

**ADVISEMENT OF RIGHTS**

I, Jayvon Benton, acknowledge receiving a copy of the Complaint containing the charges filed against me. My constitutional rights and court procedures have been explained to me. Below is an explanation of the detention hearing, which includes an outline of my constitutional rights. My signature appears at the end of this form.

**I voluntarily enter a plea of** (X) **Denial** ( ) **Admission to the charges.**

I am able to read and understand the English language. I do not require the reading of the Complaint or having my rights and court procedures explained to me again in the courtroom and on the record. No threats or promises have been made to induce me to sign this or enter this plea. Since I am entering an appearance for this hearing, I do not require service of summons.

**EXPLANATION OF DETENTION HEARING**

You were taken into custody and admitted to the Cuyahoga County Juvenile Detention Center on 8-29-15.

Pursuant to Ohio Revised Code Section 2151.314(A) and Ohio Juvenile Rule 7, the Court must hold an informal detention hearing within seventy-two (72) hours of your admission to determine whether further detention or shelter care is required. At the hearing, the Court may consider any evidence in favor of or against your detention, including testimony or reports filed by the person who brought you to the facility. Formal rules of evidence are not required to be followed.

If a delinquency Complaint has been filed against you, before your detention hearing, the Court may ask you to admit or deny the charges in the Complaint.

If you have not received a copy of the Complaint, one will be given to you and the nature of the charges explained before you enter your plea. At the hearing, your legal rights must also be explained. They are outlined below:

- **You have the right to know and understand the charge(s) against you.** *(Do not be afraid to ask any questions)*
- **You have the right to have what is said in court recorded and put into writing** without any fees if you cannot afford them.
- **You have the right to a trial.** At trial a Judge, based on what is said in court, decides if you committed the crime by proof beyond a reasonable doubt. The judge has to be almost 100% sure that you committed the crime before he can say you are guilty. You never have to tell the judge anything about your case and he is not allowed to be mad at you if you do not say anything in court. Prosecutors are attorneys that work for the government. Part of the prosecutor's job is to convince the judge that you are guilty. You have the right to make the prosecutor prove the case against you even if you think you are guilty.
- **You have the right to cross-examine witnesses.** At trial, you can ask questions of anyone that speaks to the judge about your case. Your attorney can ask questions for you.
- **You have the right to make people come to court** to tell the Judge what they know about your case if you think what they have to say may help your defense.
- **You have the right to remain silent.** You do not have to talk to anyone about your case. YOU SHOULD NEVER TALK TO A POLICE OFFICER, SHERIFF'S DEPUTY, SOCIAL WORKER, DETENTION HOME OFFICER, OR PROBATION OFFICER ABOUT WHAT HAPPENED IN YOUR CASE WITHOUT FIRST TALKING TO A LAWYER. They may tell the judge what you said which can help to find you guilty. They may trick you into saying things that can hurt your case.
- **You have the right to a lawyer from the very beginning of your case and until it is finished.** You do not have to hire one; the court will pay the lawyer for you if you don't have enough money. Your lawyer cannot tell anyone what you told him without your permission. ALWAYS ASK FOR A LAWYER AND NEVER SAY YOU DON'T WANT ONE. Do not be afraid to ask your lawyer questions. Your lawyer should explain what is happening and give you choices to consider but you should be the one making the decisions, not the other way around.

Jayvon Benton    8/31/15
MINOR                    DATE

Sean    8/31/15
ATTORNEY    DATE



Defere Exhibit

EXHIBIT
B
Defender

| CUYAHOGA COUNTY JUVENILE COURT DETENTION SERVICES DEPARTMENT *POLICY & PROCEDURE* | Chapter: **COMMUNICATION: MAIL, VISITING, TELEPHONE** |
|---|---|
| Effective Date: September 1, 1988 | Subject: **VISITATION** |
| Revised Date: April 15, 2003 October 1, 2009 January 19, 2005 June 30, 2010 April 18, 2006 October 2, 2011 December 19,2007 April 4, 2012 February 10,2015 | Policy No.: **16.3** |
| Standards: 3D-02, 5G-06, 5G-12, 5G-13, 5G-14, 5G-14-1, 5G-15 | Pages: **9** |
| Approved by: **SUPERINTENDENT** | Reviewed 2016: _____ Reviewed 2015: _____ Reviewed 2017: _____ |

I.  **POLICY:**

As the Cuyahoga County Juvenile Detention Center (CCJDC) recognizes residents' need for and right to maintain contact with people outside the CCJDC, we encourage residents to maintain contact with their authorized visitors through a regular visitation program that provides a reasonable degree of privacy consistent with CCJDC order, safety and security. The CCJDC Visitation Program shall provide residents with a minimum of three assigned visitation periods per week, at least one of which must be scheduled in the evening or on the weekend. Provisions shall be made for special visitation.

**5G-12, 5G-14, 5G-14-1**

II.  **DEFINITIONS:**

As used in this document, the following definitions shall apply:

A.  Authorized Visitors:

1.  Parents:

Parents Includes parents, stepparents, guardians, custodians, and grandparents.

| Chapter | Subject | Policy # | Page |
|---|---|---|---|
| COMMUNICATION: MAIL, VISITING, TELEPHONE | VISITATION | 16.3 | 2 of 9 |

2. Authorized Exceptions:

Authorized exceptions includes relatives or significant adults who have received a court order or prior authorization to visit from the Superintendent/designee, Deputy Superintendent, Unit Manager, or Social Worker with approval of their Unit Manager.
Special Visits shall fall under the guidance of this exception.

3. Professionals:

Professionals includes probation officers, clergy, attorneys, guardian ad litem, law enforcement, any other professional staff, and others who have received prior authorization and/or are currently involved in providing service to the resident.

B. Contraband:

Any item that is illegal by law or that is expressly prohibited by the CCJDC (e.g., weapons, article that can be used as weapons, drugs, alcohol, matches, and cigarettes).

C. Proper ID:

For Parental visitation:

Upon arrival, the visitor must produce one photographic identification card. This identification may be in the form of a driver's license; military or state-issued identification card; or other reliable identification documents.

For Professional Visitors: **See Post Order for professional visitors**

1. Attorneys are required to show a valid Bar Association Card that contains their license number. In the event the Bar Association Card is not produced, a Business Card and Driver's License are required. The Professional Visitors Attorney Form must also be completed and signed.

| Chapter | Subject | Policy # | Page |
|---------|---------|----------|------|
| COMMUNICATION: MAIL, VISITING, TELEPHONE | VISITATION | 16.3 | 3 of 9 |

2. Probation officers are required to show their Cuyahoga County Identification Badge that indicates their position as a probation officer.

3. Other agency employees and law enforcement are required to show photographic identification that indicates their title and organization.

4. The Social Worker inputs resident information in the Detention Management System, (DMS).

III. **PROCEDURES:**

A. Visitation Schedule:

1. For Parents and Authorized Exceptions:

    Regular visitation hours shall be maintained and published in the Resident Handbook, Parent Handbook and posted in the CCJDC Lobby.

2. Visiting for Professionals:

    Professional visitation shall occur during the hours set.  Special visitation may be arranged.

    Resident's who have professional visitors are brought to the interview area. Upon request, arrangements shall be made for additional confidentiality during the interview.

    Ohio Juvenile Rule 7 (J) and Ohio Revised Code (ORC) 2151.352 state that a resident's attorney may visit the resident at any time.  Attorneys are encouraged to schedule their visits weekdays from 8:00 AM to 4:00 PM.  Should an attorney need to visit a resident outside these hours, special arrangements can be made with the Unit Manager/Designee.
    **3D-02**

| Chapter | Subject | Policy # | Page |
|---|---|---|---|
| **COMMUNICATION: MAIL, VISITING, TELEPHONE** | **VISITATION** | **16.3** | **4 of 9** |

B. Visiting Conditions:

1. Visitors shall report to the CCJDC Reception Area in the

2. CCJDC Lobby and present a proper I.D. (See II, C, page 2 of 6 above) to the Social Worker/Designee at least twenty (20) minutes prior to the scheduled visitation time.

3. All visitors to the CCJDC are required to enter through the CCJDC Lobby where they shall be subject to a security screening, including metal detector, and may be subject to a search. Any visitor who refuses the screening shall be refused admission to the CCJCC.

4. A visitor may be denied visitation or removed from visitation if there is probable cause to believe that the visitor's or resident's condition or behavior may threaten the safety, security, or order of the CCJDC and/or the visitation process.  All visitors must be properly attired. Any visitor that is obviously intoxicated, extremely hostile, verbally abusive, and/or unable to control their behavior or comply with rules and regulations shall be denied visitation.

   CCJDC staff supervising resident visitation shall document such action by completing the CCJDC Incident Report form prior to the end of their shift on the date this occurred.

4. A resident may refuse a visitor.  When this occurs, the resident shall be requested by their assigned Social Worker to document the refusal in writing and the written refusal shall be placed in the resident's permanent case record.  Their assigned Social Worker shall inform the resident's Probation Officer (if assigned) and Cuyahoga County Juvenile Court (CCJC) jurist of this refusal in a timely fashion.

5. Visitation may be denied or approved by CCJDC jurist order.

6. Prescribed medication(s) for a resident may only be accepted by Qualified Health Care Services staff.

**5G-06, 5G-12, 5G-15**

| Chapter | Subject | Policy # | Page |
|---------|---------|----------|------|
| **COMMUNICATION: MAIL, VISITING, TELEPHONE** | **VISITATION** | **16.3** | **5 of 9** |

C.  Parental Visitation:

Parental visitation shall occur during the hours set with the Unit Manager's approval:

1.  Visitors shall report to the CCJDC Reception Area in the Lobby and present a proper I.D. (See II, C, page 2 of 6 above) to the Social Worker/Designee twenty (20) minutes prior to the scheduled visitation time.  Social Worker shall escort visitors to the visitation area.  All visitors shall pass a security screening in the Lobby conducted by Cuyahoga County Sheriff Office Division of Protective Service, including a metal detector.

2.  The Social Worker/Designee shall check the visitation list in iCASE, which contains the names of the entire resident's approved visitors and any restrictions.

3.  The Social Worker/Designee shall register the name of the person who is visiting in iCASE and shall give the visitor a visitation badge.

4.  The Visitation Program Staff shall escort residents who have visitors to the visitation area.  No individual staff member shall travel with more than six (6) residents at a time.

5.  Prior to being escorted to the visitation area, all visitors shall pass a security screening in the Lobby conducted by Cuyahoga County Sheriff Office Division of Protective Service, including a metal detector. No coats, purses, bags, etc. are permitted in the visitation area.  Lockers shall be provided in the Lobby for storage of these articles during visitation.  A second security screening shall be conducted by the social worker/designee immediately before the visitors enter the visitation area.  The social worker/designee shall escort the visitors through the metal detector.

6.  Residents who have visitors shall be brought to the visitation area by visitation program staff where visitation permitting informal communication, including the opportunity for limited

| Chapter | Subject | Policy # | Page |
|---------|---------|----------|------|
| **COMMUNICATION: MAIL, VISITING, TELEPHONE** | **VISITATION** | **16.3** | **6 of 9** |

appropriate physical contact consistent with CCJDC order, safety and security, shall occur. No food or drink shall be permitted during visitation.

7. Residents in Confinement at time of visitation shall be released if they have gained control of their behavior. Residents not in control of their behavior may be denied a visit and shall require specific instructions from their Unit Manager.

8. At the termination of visitation, visitors shall be escorted back or directed back to the lobby by visitation program staff.

9. Residents shall be searched by trained CCJDC staff for contraband before returning them to their scheduled program area.

**5G-13, 5G-15**

D. Professional Visitation:

Professional visitation shall occur during the hours set. Special visitation may be arranged:

1. All professional visitors shall report to the CCJDC Reception area in the Lobby where they shall register in the Professional Visitor's Log entering the information requested. All professional visitors are required to show identification that verifies their profession (See II, C above). Professional visitors shall be issued a visitor's badge that they are required to display at all times during their visit.

2. All law enforcement and social service agency social workers must have prior approval by the resident's defense attorney. The only exception shall be the resident's assigned Cuyahoga County Department of Children and Family Services (CCCFS) social worker when CCCFS has legal custody of the resident.

3. All clergy who wish to visit residents shall obtain prior approval from the CCJDC Volunteer Coordinator, who shall complete the Religious Visitor Registration form. All clergy shall present their valid clergy card to Lobby reception staff.

4. All professional visitors shall be escorted to the interview area by CCJDC staff where they shall be entered in iCASE by

| Chapter | Subject | Policy # | Page |
|---|---|---|---|
| COMMUNICATION: MAIL, VISITING, TELEPHONE | VISITATION | 16.3 | 7 of 9 |

security staff documenting their name, the date, and the time of the interview.

5. Resident's who have professional visitors shall be escorted to the interview area by CCJDC staff. Upon request, arrangements may be made for additional confidentiality during an interview.

E. Special visitation for unauthorized visitors:

1. Persons requesting permission to visit as an authorized exception, and/or outside the established schedule shall be directed to the resident's assigned Social Worker.  Special visitations shall be granted with a valid court order, and with prior approval of their Unit Manager/designee.

2. Persons making requests for special visitation shall be made aware that these are exceptions and normally require an unusual situation or circumstance.

3. Requests for special visitation must be made at least 24 hours in advance.

4. Food and/or beverages of any kind are prohibited.

5. Special visits shall be limited to one hour in the visitation room.

5. All special visits shall occur in the CCJDC visitation area. All exceptions must be approved by the Security Manager/Designee.

6. All special visits shall be reported in writing to the Security Manager/Designee at least 24 hours in advance by utilizing the Special Visitor Request Form. The form shall be filled out in its entirety, including approving signatures and the original placed in the Resident Folder after completion of the visit.  The valid court order shall be attached.

| Chapter | Subject | Policy # | Page |
|---|---|---|---|
| **COMMUNICATION: MAIL, VISITING, TELEPHONE** | **VISITATION** | **16.3** | **8 of 9** |

7. In instances of the verifiable death or critical illness of an immediate family member, CCJDC residents shall be notified in a timely manner by their assigned Social Worker/Designee. In case of the critical illness of an immediate family member, the resident shall be permitted, whenever circumstances allow and with the prior approval of the CCJDC Superintendent/Designee, to visit the bedside under CCJDC staff escort or alone.

**5G-14, 5G-14-1**

F.   Annual review and Updating:

This policy and procedure(s) shall be reviewed annually and updated as needed.

| Chapter | Subject | Policy # | Page |
|---|---|---|---|
| **COMMUNICATION: MAIL, VISITING, TELEPHONE** | **VISITATION** | **16.3** | **9 of 9** |

### Standards Addressed in this P/P:

**3-JDF-3D-02**    Written policy, procedure and practice ensure and facilitate juvenile access to counsel and assist juveniles in making confidential contact with attorneys and their authorized representatives. Such contact includes but is not limited to telephone communications, uncensored correspondence and visits.

**3-JDF-5G-12**    Written policy, procedure, and practice grant juveniles the right to receive visits, subject only to the limitations necessary to maintain facility order and security.

**3-JDF-5G-13**    Written policy, procedure, and practice provide that juvenile visiting facilities permit informal communication, including opportunity for physical contact.

**3-JDF-5G-14**    Written policy, procedure, and practice govern special visits.

**3-JDF-5G-14-1**    Written policy, procedure, and practice require that a juvenile is informed in a timely manner of the verifiable death or critical illness of an immediate family member. In case of the critical illness of an immediate family member, the juvenile is allowed, whenever statutes and circumstances allow, to go to the bedside under escort or alone.

**3-JDF-5G-15**    Written policy, procedure, and practice specify (1) that visitors register on entry into the facility and (2) the circumstances under which visitors are searched and supervised during the visit.



THE CUYAHOGA COUNTY JUVENILE DETENTION CENTER
OUT OF BUILDING PASS

Data Entry (initials): _____

RESIDENT NAME: _Jayvon Beator_____ HOUSING UNIT/POD __2C__

**LEAVE**

Day: _Tue_____ Date: _9-1-15____ Time: _ASAP___

Approved By: _Scott Koch_____

Reason for Out of Building: _processed down at county jail_

Location: _Justice Center_____

With: _CPO 2nd Sgt. Shoulders_____

☐ Sheriff  ☐ DC Driver  ☐ Ambulance  ☐ Other: _____

Staff Signature: _____

Clothing:  Own  ☒ DH

**RETURN**

Day: _sr_____ Date: _9-1-15____ Time: _8:10 pm___

Returned By: _____

Staff Signature: _____

rev. 7/1/15 jem / 5243

EXHIBIT

Defense

Page 1 of 1 of 0908853099